UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**BERKSHIRE HATHAWAY
SPECIALTY INSURANCE CO.,**

   Plaintiff,

v.   No. 4:22-cv-01137-P

**INTERSTATE FIRE & CASUALTY
CO., ET AL.,**

   Defendants.

## MEMORANDUM OPINION & ORDER

Before the Court are motions for summary judgment filed by Canal Insurance Company ("Canal") and Interstate Fire & Casualty Company ("Interstate"), respectively. ECF Nos. 194, 197. After considering the motions, the briefs, and the applicable law, the Court will grant Canal's motion in full and Interstate's motion in part.

## BACKGROUND

This case is part of a tangled web of disputes over excess liability insurance coverage for personal-injury claims reaching back more than four decades. Intervenor Murco Wall Products, Inc. ("Murco") has manufactured and sold drywall and paint products since 1971. Many of Murco's products sold during the 1970s and '80s contained asbestos. Plaintiffs in several state-court lawsuits sued Murco, alleging that they became ill after—in some cases, decades after—breathing in asbestos fibers. Plaintiff Berkshire Hathaway Specialty Insurance Company ("Berkshire") indemnified Murco and now seeks contribution from Canal and Interstate, who insured Murco in the mid-1980s. Canal and Interstate deny that their policies covered the claims in the underlying lawsuits and move for summary judgment.

## A. The Underlying Suits and the History of Coverage

The present dispute relates to three lawsuits: *Smith*, *Murray*, and *Galier* (the "Underlying Suits").[1] In *Smith,* Randall Smith's survivors alleged that he was exposed to asbestos from 1958 to 1983, which caused him to develop lung disease gradually until he ultimately died of his symptoms in 2015.[2] *Smith* Pet., ¶¶ 22–23, 63–64. In *Murray*, plaintiffs allege that decedent William H. Murray inhaled asbestos fibers from 1950 to 1979, developed lung disease, and died in 2012.[3] *Murray* Pet. ¶ 8, Ex. A, Ex. B. And in *Galier*, Michael Galier alleged he developed mesothelioma because of his exposure to asbestos in products made by Murco and others from 1970 to the late 1980s.[4] *Galier* Pet. ¶¶ 23–25.

Murco looked to its primary insurers to cover its liability losses in the Underlying Suits. Most of the primary insurers left the picture either by becoming insolvent or by paying Murco up to their policies' limits. Murco then turned to its excess insurers. In *Smith* and *Murray*, Murco negotiated settlements and received indemnification payments from Berkshire and two other excess insurers. Canal and Interstate denied that the *Smith* and *Murray* cases had triggered their policies and refused to contribute. The third case, *Galier*, resulted in a now-final judgment against Murco. Berkshire and four other excess insurers, including Canal, contributed their shares toward the satisfaction of the judgment. Interstate contributed a lesser amount—which it had committed to pay in an appellate bond under reservation of rights—but denied coverage and refused to increase the amount.

---

[1]The plaintiffs' pleadings from all three cases appear as part of the appendix to Interstate's motion. ECF No. 199 at 57–79 ("*Galier* Pet."), 94–113 ("*Smith* Pet."), 229–46 ("*Murray* Pet.").

[2]*Sylvia Smith, Individually and as Personal Representative of the Estate of Randall L. Smith, Deceased; Ronald Smith, Sandy Fellers, Shawn Smith, and Steve Smith v. Ace Hardware Corporation, et al.*, No. 2016-60174, Before the Asbestos MDL Pre-Trial Judge in the 11th Dist. Ct. of Harris Cnty., Tex.

[3]*Schlageter, et al. v. Georgia-Pacific, LLC, et al.*, No. CJ-2014-287, Dist. of Canadian Cnty., Okla. (called "*Murray*" after the name of the decedent).

[4]*Galier v. Murco Wall Prods., Inc., et al.*, No. CJ-2012-06920, Dist. of Okla. Cnty., Okla., *judgment aff'd*, 528 P.3d 293 (Okla. 2002).

## B. Procedural Background of This Suit

The last remaining primary insurers, ACE American Insurance Company and ACE Property & Casualty Insurance Company (together, "ACE"), filed this action. ACE sought a declaratory judgment clarifying its defense obligations to Murco. ACE and Murco have since settled all claims between them. The rest of the excess insurers, other than Berkshire, Canal, and Interstate, have also settled.

Berkshire filed crossclaims against Murco, Canal, Interstate, and other parties who are no longer part of the case.[5] Because Murco had picked Berkshire to fund the settlement and defense of the Underlying Suits, Berkshire sought a judicial declaration that other insurers, including Canal and Interstate, had to reimburse Berkshire for their pro rata shares of the settlement costs. Berkshire argued that Canal's and Interstate's policies covered the claims in the Underlying Suits.

Canal and Interstate now move for summary judgment. They argue that Berkshire has not raised a genuine issue of fact that any of the Underlying Suits triggered their policies. They maintain that they have no obligation to contribute to Murco's settlement or defense costs because all the Underlying Suits allege personal injuries arising from occurrences that ended before their policy periods started.

This dispute requires the Court to decide when an "occurrence" is deemed to have taken place under occurrence-based policies like the policies in this case. There are many theories. Canal and Interstate argue that binding precedent applying Texas law endorses the *exposure theory*. On that theory, occurrence-based policies only cover the insured when at least part of the asbestos exposure occurs during the policy period. In contrast, Berkshire contends that Texas law does not impose one trigger theory for all asbestos claims.[6] Instead, Texas law requires courts to approach the trigger issue on a case-by-case basis according to

---

[5]Berkshire and Murco also filed crossclaims against each other. The Court dismissed all those claims on February 20, 2025. ECF No. 226.

[6]After realigning the case, the Court designated Murco as an intervenor. ECF No. 26. Murco responds to Canal's and Interstate's motions and makes arguments similar to Berkshire's. Thus, when this opinion discusses Berkshire's arguments, in most cases Murco is included implicitly.

the express terms of each policy. Berkshire urges the Court to interpret the Canal and Interstate policies using an *injury-in-fact theory*, under which the policies cover asbestos-based injuries that occur during the policy periods, even if the claimant's actual exposure to asbestos ended before the policy periods began.

### C. The Language of the Canal and Interstate Policies

The relevant parts of the Canal policy read as follows:

> The company will indemnify the insured for all sums which the insured shall become legally obligated to pay as damages and expenses, all as hereinafter defined as included within the term ultimate net loss, by reason of liability,
>
> > (a) imposed upon the insured by law, or
> >
> > (b) assumed by the named insured, or by any officer, director, stockholder or employee thereof while acting within the scope of his duties as such, under any contract or agreement other than liability assumed with respect to occurrences taking place prior to the time such contract or agreement became effective.
>
> because of
>
> > (i) personal injury caused by, or
> >
> > (ii) property damage caused by, or
> >
> > (iii) advertising liability arising out of
>
> an occurrence which takes place during the policy period anywhere in the world.
>
> . . .
>
> "Occurrence" means an accident which takes place during the policy period, or that portion within the policy period of a continuous or repeated exposure to conditions, which causes personal injury, property damage or advertising liability neither expected nor intended by the insured.
>
> . . .
>
> "Personal Injury" means (1) bodily injury, sickness, disease, disability or shock, including death arising therefrom, or, if arising out of the foregoing, mental anguish and mental injury;

4

. . .

"Ultimate Net Loss" means the total of the following sums arising with respect to each occurrence to which this policy applies:

> (a) all sums which the insured, or any organization as his insurer, or both, become legally obligated to pay as damages, whether by reason of adjudication or settlement, because of personal injury, property damage or advertising liability; and

> (b) all expenses incurred by the insured in the investigation, negotiation, settlement and defense of any claim or suit seeking such damages, excluding only the salaries of the insured's regular employees.

The Interstate policy has similar language:

> The company agrees to pay on behalf of the insured for all sums which the insured shall become obligated to pay as damages, direct or consequential, and expenses, all as hereinafter defined as included within the term ultimate net loss, by reason of liability
>
>> (a) imposed upon the insured by law, or
>
>> (b) assumed by the named insured, or by any officer, director, stockholder or employee thereof while acting within the scope of his duties as such, under any contract or agreement,
>
> because of personal injury, property damage, or advertising liability caused by or arising out of an occurrence which takes place during the policy period anywhere in the world.
>
> . . .
>
> "Occurrence" means injurious exposure to conditions, which results in personal injury, property damage or advertising injury or damage neither expected nor intended from the standpoint of the insured . . . .
>
> . . .
>
> "Personal injury" means (a) bodily injury; shock, disability, sickness or disease (including death, and care and loss of services, mental anguish and mental injury resulting therefrom);
>
> . . .

5

> "Ultimate net loss" means the total of the following sums arising out of any one occurrence to which this policy applies:
>
>> (a) all sums which the insured or any organization as his insurer, or both, become legally obligated to pay as damages, whether by reason of adjudication or settlement, because of personal injury, property damage or advertising liability; and
>>
>> (b) all expenses incurred by the insured or any organization as his insurer, or both, in the investigation, negotiation, settlement and defense of any claim or suit seeking such damages, excluding only (1) the salaries of the insured's or insurer's regular employees, (2) office expenses of the insured or any insurer, and (3) all expense [sic] included in other valid and collectible insurance.

## LEGAL STANDARD

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it would affect a case's outcome. *Id.* In assessing if summary judgment is warranted, the Court "view[s] all evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Cunningham v. Circle 8 Crane Servs., LLC*, 64 F.4th 597, 600 (5th Cir. 2023).

While the Court may consider any evidence of record, it need only consider materials cited by the parties. FED. R. CIV. P. 56(c)(1)–(3); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). But the Court need not mine the record for evidence supporting the nonmovant. *See Malacara v. Garber*, 353 F.3d 393, 404–05 (5th Cir. 2003). In this regard, "[s]ummary judgment is appropriate when 'the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'" *Edwards v. Oliver*, 31 F.4th 925, 929 (5th Cir. 2022) (quoting *Celotex*, 477 U.S. at 323) (citation omitted).

## ANALYSIS

The Canal and Interstate policies cover liability for personal injuries arising out of an "occurrence," which means "that portion within the policy period of a continuous or repeated exposure to conditions, which causes personal injury" (Canal) or "injurious exposure to conditions, which results in personal injury" (Interstate). The plaintiffs in the Underlying Suits were exposed before the policy periods but allegedly continued to develop disease during the policy periods. Berkshire and Murco argue that bodily injury caused by latent asbestos in the lungs falls within the policies' definitions of "occurrence." Berkshire provides evidence that asbestos fibers become lodged in the lungs and continue to cause tissue damage long after inhalation. Canal and Interstate contend that their policies only cover liability for asbestos exposure that occurs during the policy period.

### A. Determining the Proper Trigger Theory

The Court applies Texas law, as interpreted by the United States Court of Appeals for the Fifth Circuit, to interpret the policies. Absent a conflict of laws, a federal court should apply the law of the forum state in a diversity case. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The parties do not dispute that Texas law applies, and neither does the Court. Where the forum state's highest court has not addressed a question, a federal court must make an "*Erie* guess" and determine how that court would most likely rule. *Terrebonne Par. Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 317 (5th Cir. 2002). This Court defers to the Fifth Circuit's interpretation of Texas law unless a decision from the Supreme Court of Texas supersedes it. *Welborn v. State Farm Mut. Auto. Ins. Co.*, 480 F.3d 685, 687 (5th Cir. 2007).

Courts faced with liability coverage of long-tail injury claims have approached the timing question under several competing theories. The Supreme Court of Texas summarized those theories and the differences between them in *Don's Building Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20 (Tex. 2008). The theories differ mainly in what they identify as the moment an "occurrence" takes place—the time of injury, the time of exposure to harmful conditions, the time of discovery, or some

7

combination of the three. *Id.* at 25–28. *Don's Building* recognized that "these varying approaches reflect perceived differences in the policy language under review." *Id.* at 25. After concluding that an injury-in-fact trigger theory best fit the policy before it, the Court in *Don's Building* clarified that it was not attempting to "fashion a universally applicable 'rule' for determining when an insurer's duty to defend a claim is triggered under an insurance policy, as such determinations should be driven by the contract language—language that obviously may vary from policy to policy." *Id.* at 30.

That caveat accords with the general rule that "[i]nsurance policies are written contracts, and, as with other contracts, [courts] interpret and enforce them according to settled rules of construction." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Crocker*, 246 S.W.3d 603, 606 (Tex. 2008). The Court gives effect to the intent of the parties as expressed in the policies and gives the policies' words their plain meaning. *Don's Bldg.*, 267 S.W.3d at 23; *Nat'l Union*, 246 S.W.3d at 606.

1. <u>The policies support an exposure trigger theory.</u>

Conveniently, the Coverage sections of the Canal and Interstate policies are similar enough to be analyzed together. The Canal policy covers liability because of "personal injury caused by . . . an occurrence which takes place during the policy period anywhere in the world." ECF No. 196 at 4. The only disputed language—"an occurrence which takes place during the policy period"—appears verbatim in both policies. ECF No. 12. These motions therefore turn on whether, under the definitions in the policies, the "occurrences" that injured the plaintiffs in the Underlying Suits took place during the policy periods. That answer, in turn, depends on the meaning of the word "occurrence."

The Canal and Interstate policies' definitions of "occurrence" differ slightly in wording, but not enough to make a material difference. The definitions appear below side by side, with the relevant portions underlined:

| Canal's definition of "occurrence" | Interstate's definition of "occurrence" |
|---|---|
| [A]n accident which takes place during the policy period, or <u>that portion within the policy period of a continuous or repeated exposure to conditions, which causes personal injury</u>, property damage or advertising liability <u>neither expected nor intended by the insured.</u> | <u>[I]njurious exposure to conditions, which results in personal injury</u>, property damage or advertising injury or damage <u>neither expected nor intended from the standpoint of the insured</u>, except that assault and battery committed by the insured for the purpose of protecting persons or property shall be deemed an occurrence. |

These definitions are substantially the same in what they cover. The common element in both definitions is "exposure to conditions, which [causes/results in] personal injury." None of the language unique to either definition makes any material difference. The Canal policy's inclusion of "that portion within the policy period" is present in the Interstate policy as well, because the "occurrence" must "take[] place during the policy period," according to the general coverage section. And Interstate's definition has one word that Canal's lacks: "Injurious." But Canal's definition also conveys that concept with the clause "which causes personal injury." In the Interstate definition, "injurious" appears slightly redundant.[7] The Canal and Interstate policies therefore define "occurrence" the same way for the purpose of these motions.

The question remains whether that common concept—exposure to conditions resulting in personal injuries—includes ongoing damage from latent asbestos fibers inhaled before the policy period started. On any plain reading of the policy language, the answer is no. Consider the phrase "exposure to conditions, which causes personal injury."

---

[7] If one wished to avoid making the word "injurious" superfluous, one could suppose that the word requires that the *exposure itself* must be injurious, as opposed to non-injurious exposures that in some way cause a later injury. But even assuming that such a distinction exists between the policies, it leads to no difference as applied here.

9

"Exposure" means "the fact or condition of being exposed."[8] "Exposed," in turn, means "open to view" or "not shielded or protected." Likewise, "expose" (as a transitive verb) means "[to] subject to risk from a harmful action or condition" or "to submit or make accessible to a particular action or influence." Murco's products subjected plaintiffs to risk from asbestos—a harmful condition. The plaintiffs allege that by breathing in asbestos fibers, they developed diseases. In other words, when the plaintiffs were around asbestos, they were *exposed* to a condition that caused personal injuries.

Other interpretations stretch the words of the policy past the point of normal speech. The injury-in-fact trigger theory would consider the word "occurrence" to include the damage that takes place in the body after a person has stopped inhaling asbestos. That would require "exposure to conditions" to refer to the post-inhalation development of disease. The chronic damage caused by latent asbestos fibers may reasonably be called an "injury," or even a "condition," but it is certainly not "exposure" to a condition. Both sides' use of the term "exposure theory" is a giveaway of their shared understanding that "exposure" refers to physical proximity to, and the inhalation of, asbestos fibers.

Murco argues that because both definitions of "occurrence" include the term "personal injury," they encompass "not just an injurious event—like the inhalation of asbestos—but also the resulting injuries." ECF No. 205 at 2. That is wrong. The policies define "occurrence" as "exposure . . . which [causes/results in] personal injury." The words "which causes personal injury" form a relative clause that qualifies "exposure." Personal injury is not part of the occurrence; it is something the occurrence causes. The policies could have defined "occurrence" to encompass personal injuries—for example, by defining it as "injurious exposure to conditions and personal injuries caused by such exposure," or something to that effect. But they do not. They require that the exposure must *cause* or *result in* personal injury or other harms. The exposure itself must occur during the policy period to trigger coverage.

---

[8]The definitions in this paragraph come from Merriam-Webster.com, last visited March 28, 2025.

2. <u>Canal and Interstate's interpretation is consistent with *Don's Building* and *Azrock*.</u>

Murco urges the Court to follow *Don's Building* in applying an injury-in-fact trigger to both policies. ECF No. 205 at 11. The Supreme Court of Texas issued *Don's Building* as an answer to two certified questions from the Fifth Circuit, including the following: "When not specified by the relevant policy, what is the proper rule under Texas law for determining the time at which property damage occurs for purposes of an occurrence-based commercial general liability insurance policy?" 267 S.W.3d at 23. The Court began by explaining that it interprets insurance policies using the same rules that apply to all contracts. *Id.* It stressed that it was not attempting to "fashion a universally applicable 'rule' for determining when an insurer's duty to defend a claim is triggered under an insurance policy, as such determinations should be driven by the contract language—language that obviously may vary from policy to policy." *Id.* at 30. The Court concluded that the policy in that case demanded an injury-in-fact trigger rule. *Id.* at 24. The policy was clear: It provided that coverage would be available only if "property damage occurs during the policy period." *Id.* (cleaned up).

That language alone suffices to distinguish *Don's Building* from this case. Whereas the policy in *Don's Building* covered liability for damage that "occurs during the policy period," *id.*, the Canal and Interstate policies cover liability for each occurrence—defined centrally as "exposure"—that takes place during the policy period. What is more, *Don's Building* was based on liability for property damage, not personal injury. The Supreme Court clarified that it expressed "no opinion as to when a claim for 'bodily injury,' 'personal injury,' or 'advertising injury' occurs under the policy, or whether the rules for determining coverage for these claims are different from the rule we adopt today for property damage claims under the policy." *Id.* at 31 n.43. For those reasons, *Don's Building* does not compel this Court to apply an injury-in-fact trigger theory.

The facts in the Fifth Circuit case *Guaranty National Insurance Co. v. Azrock Industries* are a closer analogue than those in *Don's Building*.[9] 211 F.3d 239 (5th Cir. 2000). In *Azrock*, a commercial general liability insurer sued for a declaratory judgment that it had no duty to defend its insured, a manufacturer of asbestos-containing products. *Id.* at 241–42. The policy period ran from 1985 to 1986 and covered liability for personal injuries caused by an "occurrence," defined in relevant part as "a continuous or repeated exposure to conditions which unexpectedly or unintentionally results in personal injury. . . ." *Id.* at 244. The Fifth Circuit construed the policy to require that "the actual 'injury,' not merely the negligent act or omission that causes the injury, must happen during the policy period." *Id.* But the relevant "injury" was not the manifestation of disease, as the insured argued, but the "subclinical tissue damage that occurs on inhalation of asbestos fibers." *Id.* The Fifth Circuit held that exposure was the proper coverage trigger and remanded for the district court to review whether the underlying lawsuits alleged asbestos exposure during the policy period. *Id.*

The Court today adopts the same trigger theory as the *Azrock* court, but with a slight distinction. The *Azrock* Court required the injury to take place in the policy period but limited the referent of "injury" to the initial inhalation of asbestos. *Id.* In contrast, the Court today holds that the Canal and Interstate policies do not require the injury to take place during the policy period—just the exposure. A small difference in wording between the policies accounts for this distinction. The policy in *Azrock* covered liability incurred "because of personal injury . . . caused by an occurrence during the policy period." *Id.* In contrast, the Canal and Interstate policies read, "personal injury . . . caused by an occurrence *which takes place* during the policy period" (emphasis added). In *Azrock*, "during the policy period" modified "caused"; here, it modifies "takes place."

---

[9]*Azrock* is still good law. Although the Fifth Circuit stated in dicta that *Don's Building* overruled *Azrock*, 553 F.3d 901, 903 (5th Cir. 2008) (mem. op.), the Supreme Court of Texas said otherwise: "A related if not overlapping body of law, which we do not explore today, addresses when coverage is triggered on bodily injury claims under [commercial general liability] and other policies." *Don's Building*, 267 S.W.3d at 28 (citing *Azrock*).

The Court hastens to add that its interpretation of the policies here favors coverage more than the Fifth Circuit's reading of the policy in *Azrock*. There, the occurrence *and* injury had to occur during the policy period.[10] The Court today understands the Canal and Interstate policies as requiring only exposure—not necessarily injury—during the policy period. In the end, we arrive at the same trigger rule as *Azrock*, but with the slight nuances discussed above. The Canal and Interstate policies are triggered only by exposure to asbestos during the policy periods.

## B. Whether the Underlying Suits Trigger the Policies

One more question remains: Under the exposure trigger theory, has Berkshire raised a genuine issue of material fact that any of the Underlying Suits have triggered the Canal or Interstate policies? If not, summary judgment is proper.

1. <u>The Court can properly answer the evidentiary question at this stage.</u>

First, Murco questions whether this question is set for resolution yet. It is. The Court's order of July 22, 2024, instructed Canal and Interstate to move for summary judgment, "addressing the trigger issue only[.]" ECF No. 193. That order came in response to the parties' joint report of July 3, 2024, which represented to the Court that the "Remaining Parties ask the Court to hear and decide summary judgment motions on one other threshold issue: the trigger of coverage issue (the "Trigger Issue") that was raised as issue no. 1 in Canal and Interstate's prior summary judgment motions (ECF Nos. 123 and 129)." ECF No. 192 at 3. In those motions, issue no. 1 includes the question of whether, under the exposure theory, any of the Underlying Suits triggered coverage. ECF Nos. 123 at 2; 129 at 2. By using the parties' term "trigger issue" (albeit uncapitalized), the Court's briefing schedule (ECF No. 193) incorporated the parties' framing of that issue. This is therefore the proper time for the Court to take up the coverage issue.

---

[10]Consider the Fifth Circuit's wording: "'[O]ccurence during the policy period' requires that the actual 'injury,' **not merely the negligent act or omission that causes the injury**, must happen during the policy period." *Azrock*, 211 F.3d at 244 (emphasis added).

13

### 2. Berkshire and Murco only have to present evidence that an Underlying Suit alleged exposure during the policy period.

The parties disagree about what kind of evidence—allegations or established facts—Berkshire has to show. Murco argues that allegations of coverage in the Underlying Suits are enough to trigger the Canal and Interstate policies. ECF No. 205 at 20–23. Interstate contends that allegations in the Underlying Suits are not enough, and that Berkshire must provide actual evidence of exposure during the policy periods. ECF No. 198 at 18–20. Interstate argues that because it has no duty to defend Murco—only a duty to indemnify it for losses—the Court should apply the "actually established" rule that normally applies to duty-to-defend policies. ECF No. 214 at 18–21.

The policies are straightforward: Canal and Interstate must indemnify Murco for the costs of defending lawsuits that allege injuries during the policy periods, even if those claims fail or the parties settle. Both policies obligate the insurer to pay for "all sums which the insured shall become [legally] obligated to pay as damages . . . all as hereinafter defined as included within the term ultimate net loss . . . ." (bracketed word in Canal's policy only). In turn, both policies define the phrase "ultimate net loss" as "the total of the following sums arising with respect to each occurrence[11] to which this policy applies: (a) all sums which the insured or any organization as his insurer, or both, become legally obligated to pay as damages, whether by reason of adjudication or settlement, because of personal injury . . . ; and (b) all expenses incurred . . . by the insured in the investigation, negotiation, settlement and defense of any claim or suit seeking such damages, excluding [various expenses]." ECF Nos. 196 at 5, 199 at 14. In other words, Canal and Interstate have to indemnify Murco for the following amounts: (1) damages Murco or its insurer have to pay if a plaintiff gets a judgment against Murco for covered personal injuries; (2) damages for covered personal injuries that Murco or its insurer have to pay as the result of a settlement; and (3) expenses that Murco or its insurer incur in investigating, negotiating, settling, and defending claims *seeking*

---

[11]In the Interstate policy, "arising out of any one occurrence."

damages for covered personal injuries. Thus, when a plaintiff alleges exposure during the policy period, Canal and Interstate must indemnify Murco or its insurer for defense, negotiation, and settlement expenses. And if Murco loses, or if the case settles, Canal and Interstate must indemnify Murco for the amount of its liability, assuming all other preconditions of the policies are met.

It is true, as Interstate points out, that the duty to defend usually depends on facts actually established by a factfinder. *Azrock*, 211 F.3d at 243. Courts often summarize the duties under the generalization that the duty to defend follows the "eight corners rule," which refers to the four corners of the policy plus the four corners of the underlying pleadings; while the duty to indemnify depends on the "actual facts that establish liability in the underlying lawsuit." *Colony Ins. Co. v. Peachtree Constr., Ltd.*, 647 F.3d 248, 253 (5th Cir. 2011); *see also Azrock*, 211 F.3d at 243.

But those are just general rules. The Fifth Circuit has recognized that parties can contract around the eight-corners rule. In *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, the Fifth Circuit held that the parties had chosen to displace the eight-corners rule by requiring extrinsic evidence of the insured's wrongful acts before the insurer had to advance defense costs. 600 F.3d 562, 574 (5th Cir. 2010). That court reasoned that "Texas prefers freedom of contract and honors the well-worn prerogative of parties to override judge-made doctrines—like the eight corners rule—by contracting around them." *Id.* (citations omitted). Here, the parties have done just that, but in reverse. They contracted around the usual rule that the duty to indemnify depends on facts "actually established," effectively replacing that standard with the eight-corners rule.

Interstate cites *Colony Insurance Co. v. Peachtree Construction, Ltd.* and *LGS Technologies v. United States Fire Insurance Co.* to support its argument for an established-fact standard. *Colony*, 647 F.3d 248 (5th Cir. 2011); *LGS*, No. 2:07-cv-399, 2015 WL 5934689 (E.D. Tex. Aug. 14, 2015). *Colony* is inapposite, and *LGS* supports the opposite of Interstate's position.

15

In *Colony*, the Fifth Circuit held that the excess insurer's duty to defend operated under the eight-corners rule, while its duty to indemnify depended instead on the facts actually established, either in the underlying lawsuit or in a separate trial. 647 F.3d at 252–54. The Fifth Circuit's opinion did not discuss the language of the insured's policy. But the record at the district court includes a copy of the Colony policy, which reads: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages." Colony's First Am. Compl., 2008 WL 5364632, ¶ 5.2. The difference between that indemnification language and the language in the Canal and Interstate policies stands out. Canal and Interstate agreed to indemnify Murco not only for damages Murco becomes liable to pay "as damages," but also "by reason of . . . settlement." They also agreed to indemnify Murco for costs incurred in defending, negotiating, and settling suits *seeking* covered damages, whereas Colony only agreed to defend its insured in those cases.

Compared to the policy in *Colony*, the policy in *LGS* bears a closer resemblance to the Canal and Interstate policies. ECF No. 214 at 19. In *LGS*, an excess insurer agreed in its policy to indemnify its insured for "ultimate net loss," defined to include "expenses . . . incurred by the insured in the investigation, negotiation, settlement, and defense of any claim or suit seeking such damages." 2015 WL 5934689, at *12. What follows in the court's analysis may be easy to misconstrue. Although the *LGS* court did purport to measure the insurer's duty to indemnify based on the "facts actually established," the "facts" it pointed to were actually allegations in the underlying lawsuits. The court wrote that "[t]he facts 'actually established' indicate $2,432,306.44 paid in settlement payments to such claimants. The facts 'actually established' indicate $3,171,028.61 paid by Trinity . . . to defend LGS in the asbestos litigation and negotiate the settlements shown in Trinity's spreadsheets."[12] *Id.*

---

[12]The Court expresses no opinion as to whether the *LGS* court made a typographical error or whether it simply chose an unusual way of expressing

16

*LGS* does not support the argument Interstate cites it for. Under the Canal and Interstate policies, mere allegations of exposure during the policy periods trigger the duty to indemnify.

3. <u>Berkshire and Murco raise a genuine issue of material fact about coverage only as to *Galier*.</u>

Having determined that an exposure trigger theory applies, the Court concludes this opinion by searching the pleadings in the Underlying Suits for allegations of exposure that took place during the policy periods. To be precise, the Canal policy period ran from June 15, 1984 to June 15, 1985. ECF No. 196 at 3. And the Interstate policy period ran from June 17, 1985 to June 15, 1986. ECF No. 199 at 10.

    a. *Smith*

The plaintiff in *Smith* did not allege any exposure during either policy period. The petition alleges that the decedent, Randall L. Smith, worked with and around Murco's asbestos-containing products during his time as owner and operator of Randall Smith Construction from 1973 to 1983. *Smith* Pet. ¶ 22.d. Randall was also exposed to Murco's asbestos-containing products when he renovated his home in 1975. *Id.* ¶ 22.e. The petition alleges no exposure after 1983.

    b. *Galier*

The petition in *Galier* alleges that Michael Galier worked as a contractor "from approximately 1982 to the late 1980s" and as an automotive mechanic "[i]n the early 1990s[.]" *Galier* Pet. ¶ 23. Galier alleges that during those years, he was exposed to asbestos-containing products, including Murco's joint compound. *Id.* Interstate replies that the facts actually established in *Galier* show a timeline of exposure that ended long before its policy period. ECF No. 214 at 15. For example, when the Oklahoma Supreme Court affirmed the judgment against Murco in *Galier*, it recited that "Michael Galier was exposed to asbestos in Oklahoma in the 1970s." *Id.*; *Galier v. Murco Wall Prods., Inc.*, 528 P.3d 293, 296 (Okla. 2002). But the Court has decided that facts actually

---

its reasoning. In either event, it reached the same conclusion this Court reaches based on very similar policy language.

17

established are not relevant—allegations are. The allegations in the *Galier* petition are indisputably vague (e.g., the exact dates included in "the late 1980s" is ambiguous), and some evidence suggests that Galier himself may have changed his timeline theory later in that litigation. But the petition is enough to create a genuine issue of material fact that there existed a suit seeking damages covered by the policies here, which triggered Interstate and Canal's duty to indemnify.

### c. *Murray*

The *Murray* petition helpfully includes an exhibit listing the date ranges of the decedent's alleged exposure, organized by job. *Murray* Pet., Ex. A. The petition alleges exposure to Murco products from 1957 to 1976 and 1976 to 1979. *Id.* The petition mentions no exposure to Murco products during the 1980s.

* * *

Out of the three Underlying Suits, only in *Galier* does there exist a genuine issue of material fact as to coverage. The petitions in *Smith* and *Murray* allege exposure to asbestos from Murco's products ending in 1983 and 1979, respectively. But the *Galier* petition, while vague, does allege that the decedent was exposed to Murco's asbestos-containing products into the "late 1980s." That evidence prevents the Court from granting summary judgment to Interstate as to *Galier*. But the Court can and will grant partial summary judgment for Interstate on Berkshire's claims for contribution for the *Smith* and *Murray* lawsuits. Because Canal's summary-judgment motion does not relate to *Galier* at all, the Court can fully grant summary judgment in favor of Canal on Berkshire's contribution claims.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Canal's motion for summary judgment in full and **GRANTS** Interstate's motion for summary judgment as to Berkshire's crossclaims for declaratory relief regarding the application of the proper trigger theory and as to Interstate's obligation with respect to the *Smith* and *Murray* lawsuits. The Court **DENIES** Interstate's motion as to the *Galier* lawsuit.

**SO ORDERED** on this **31st day of March 2025.**

_____
Mark T. Pittman
UNITED STATES DISTRICT JUDGE